IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | § | | APR **1 5** 2021 |
| | § | | |
| v. | § | No. 4:20-CR-358 | Clerk, U.S. District Court |
| | § | JUDGE ALM/KPJ | Eastern District of Texas |
| NEERAJ JINDAL (1) | § | | |
| JOHN RODGERS (2) | § | | |

**FILED**
Clerk, U.S. District Court
Eastern District of Texas

## FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

## Count One

Violation: 15 U.S.C. § 1
(Antitrust Conspiracy: Price Fixing)

Introduction

At all times relevant to this Count:

1.　　Home health agencies arrange for home health care workers to provide health care services to patients in their home or assisted living facility.  Home health care can include physical therapy, which is provided by physical therapists ("PTs") and physical therapist assistants ("PTAs") who travel to patients' homes or assisted living facilities to provide care.

2.　　Home health agencies often contract with therapist staffing companies to provide PT and PTA services to home health patients.  Therapist staffing companies, in turn, contract with or employ the PTs and PTAs who perform the physical therapy.  The cost of home health care, including physical therapy, is often paid by federal Medicare Program ("Medicare") funds or by private insurers.

3.      Medicare is a federal health care program providing benefits to persons who are over the age of 65 or disabled, and is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare & Medicaid Services.  Medicare covers eligible home health care services provided by a participating home health agency to Medicare beneficiaries who are confined to their homes and have a medical need for skilled services including, among other things, physical therapy.  Claims for qualifying home health care services are reimbursed to the home health agency based on contract rates determined by Medicare.

4.      Therapist staffing companies compete with each other to contract with or employ PTs and PTAs.  PTs and PTAs may contract with or be employed by multiple therapist staffing companies and choose among them based on pay rate, volume of patient referrals, and location of patients.

5.      Defendant **Neeraj Jindal** ("**Jindal**"), residing in the Eastern District of Texas, was the owner of a therapist staffing company, Company A.  Company A was a limited liability company organized and existing under the laws of the State of Texas with its office in the Eastern District of Texas.

6.      Defendant **John Rodgers** ("**Rodgers**") was a physical therapist who contracted with Company A and was a clinical director of Company A.  **Rodgers** reported to **Jindal**.  **Rodgers** had previously founded a therapist staffing business and sold it to **Jindal**'s Company A, which then continued operating the business using its existing name as an assumed name for Company A.

7.      Company A contracted with PTs and PTAs to provide in-home physical therapy services to patients located in the Dallas-Fort Worth metropolitan area.  Each PT and PTA who contracted with Company A had set prices (a "rate" or "pay rate") that Company A paid them for providing in-home care visits.  Company A billed home health agencies set prices (the "bill rate") for providing therapy services.  The difference between the pay rates that Company A paid to its PTs and PTAs and the bill rates that it billed to home health agencies constituted Company A's margin.

8.      Individual 2 owned Company B, which was a therapist staffing company that provided PT and PTA staffing services in the Dallas-Fort Worth metropolitan area.  Company B competed with Company A to contract with PTs and PTAs.

9.      Various commercial entities and an individual, not made defendants in this Count, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

10.     Whenever in this First Superseding Indictment reference is made to any act, deed or transaction of any commercial entity, including any company, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, members, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

Description of the Conspiracy

11.     From in or around March 2017 to in or around August 2017 (the "Relevant Period"), in the Eastern District of Texas and elsewhere, **Jindal**, **Rodgers**, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition

by agreeing to fix prices by lowering the pay rates to PTs and PTAs.  The conspiracy

engaged in by **Jindal**, **Rodgers**, and co-conspirators was a *per se* unlawful, and thus

unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the

Sherman Act (15 U.S.C. § 1).

Means and Methods of the Conspiracy

12.     For the purpose of forming and carrying out the charged conspiracy,

**Jindal**, **Rodgers**, and co-conspirators, among other things, provided and received non-

public rates paid to PTs and PTAs; communicated about rate decreases; discussed and

agreed to decrease rates paid to PTs and PTAs; implemented rate decreases in accordance

with the agreement reached; and paid PTs and PTAs at collusive and noncompetitive

rates.  For example, **Jindal**, **Rodgers**, and co-conspirators did the following:

(a)     On March 10, 2017, beginning at approximately 1:36 p.m. CST,

**Rodgers**, acting on behalf of **Jindal** and Company A, texted with Individual 2, the

owner of competitor Company B, regarding the rates that Company A and

Company B paid their PTs and PTAs.  **Rodgers** texted:  "Have you considered

lowering PTA reimbursement. . . . ."  Individual 2's response stated, in part, "the

therapists are overpaid."  **Rodgers** texted:  "I think we're going to lower PTA

rates to $45."  Individual 2 responded by texting:  "Yes I agree," "I'll do it with

u," "I think the PT's need to go back to 60 . . . . Our margins are disappearing."

**Rodgers** responded:  "[thumbs up emoji] I feel like if we're all on the same page,

there won't be a bunch of flip-flopping and industry may stay stable."  **Rodgers**

reported back to **Jindal** regarding this text message conversation with Individual 2.

(b)     **Jindal** subsequently texted the owners of other therapist staffing companies to recruit additional competitors to join the conspiracy to collectively lower rates.  Specifically, on March 10, 2017, beginning at approximately 3:54 p.m. CST, **Jindal** separately texted at least four other owners of therapist staffing companies, including Individual 3, the owner of Company C; Individual 4, the owner of Company D; Individual 5, the owner of Company E; and Individual 6, the owner of Company F.  **Jindal** wrote to each owner:  "I am reaching out to my counterparts about lowering PTA pay rates to $45."  **Jindal** asked each owner: "What are your thoughts if we all collectively do it together?"  **Jindal** wrote to each owner that he had Company B "on board."  **Jindal** further texted Individual 3:  "I think we all collectively should move together."

(c)     On March 17, 2017, at approximately 3:44 p.m. CDT, **Rodgers**, acting in furtherance of the conspiracy, texted Individual 2.  **Rodgers** stated: "FYI we made rate changes effective next payroll Monday decreasing PT's and PTA's." In response, Individual 2 texted: "Well I can join in where did u go."  **Rodgers** and Individual 2 subsequently exchanged text messages regarding Company A's and Company B's pay rates for PTs and PTAs.

(d)     Pursuant to the agreement, Company A thereafter paid lower rates to certain PTs and PTAs.

Trade and Commerce

13.    During the Relevant Period, the business activities of **Jindal**, **Rodgers**, and their co-conspirators that are the subject of the conspiracy charged in this Count were within the flow of, and substantially affected, interstate trade and commerce.  For example, during the Relevant Period:

(a)    Insurance funds, including federal Medicare funds, traveled from banks or companies located in states outside of Texas through a home health agency to Company A in Texas, and from Company A to its PTs and PTAs to pay them for providing care to patients;

(b)    To provide care in patients' homes and assisted living facilities, PTs and PTAs used equipment and vehicles purchased in interstate commerce; and

(c)    The conspiracy was intended to lower rates paid to PTs and PTAs, which would lessen their purchases in interstate trade and commerce.

All in violation of 15 U.S.C. § 1.

## Count Two

Violation: 18 U.S.C. § 371
(Conspiracy to Commit Offense)

At all times relevant to this Count:

14.    Paragraphs 1–8 and 10 of Count One are repeated, realleged, and incorporated in Count Two as if fully set forth in this Count.

15.    Beginning in or around April 2017, and continuing at least through in or around October 2017, the Federal Trade Commission ("FTC") was conducting an

investigation ("the FTC Investigation"), pursuant to its authority under the Federal Trade Commission Act, as amended, 15 U.S.C. §§ 41, et seq. ("FTC Act"), to determine whether Company A or other therapist staffing companies violated Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

16.     Beginning in or around April 2017, and continuing at least through in or around October 2017, **Jindal** and **Rodgers** were aware of the FTC Investigation.

17.     Whenever in this Count reference is made to the FTC, the allegation includes agents, attorneys, commissioners, counsel, directors, employees, investigators, officers, and other officials of the FTC acting in their official capacities.

The Conspiracy and Its Objects

18.     From in or around April 2017, and continuing at least through in or around October 2017, in the Eastern District of Texas and elsewhere, defendants **Jindal** and **Rodgers** knowingly and willfully conspired, combined, confederated, and agreed together and with each other to commit offenses against the United States and an agency thereof, that is:

(a)     To corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding, specifically the FTC Investigation, was being had before a department or agency of the United States, specifically the FTC, in violation of 18 U.S.C. § 1505;

(b)     To knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the

executive branch of the Government of the United States, specifically the FTC

Investigation, in violation of 18 U.S.C. § 1001(a)(2); and

(c)     To knowingly and willfully make and use a false writing and

document knowing the same to contain a materially false, fictitious, and fraudulent

statement and entry in a matter within the jurisdiction of the executive branch of

the Government of the United States, specifically the FTC Investigation, in

violation of 18 U.S.C. § 1001(a)(3).

Manner and Means of the Conspiracy

19.     For the purpose of forming and accomplishing the objects and goals of the

conspiracy, **Jindal** and **Rodgers**, among other things: communicated with each other and

potential witnesses about the FTC Investigation; discussed and coordinated responses to

the FTC Investigation; deleted communications and records that were material and

relevant to the FTC Investigation; took steps to corruptly influence, obstruct, impede, and

endeavor to influence, obstruct, and impede the FTC Investigation by making false and

misleading statements to the FTC, by withholding and concealing documents and other

information from the FTC, and by destroying documents and other information; made

materially false, fictitious, and fraudulent statements and representations in the FTC

Investigation; and made and used in the FTC Investigation false writings and documents

knowing the same to contain materially false, fictitious, and fraudulent statements and

entries.

Overt Acts

20.     In furtherance of the above-described conspiracy and in order to carry out the objects thereof, **Jindal** and **Rodgers** committed and caused to be committed the following overt acts, among others, in the Eastern District of Texas and elsewhere:

(a)     After **Jindal** received a letter from the FTC, dated April 17, 2017, requesting information and documents as part of the FTC Investigation and after a subsequent phone call between **Jindal** and the FTC on or about April 25, 2017, **Jindal** and **Rodgers** spoke by phone on April 28, 2017, for approximately 21 minutes.  Later that day, **Jindal** sent an email to the FTC in which he stated falsely and misleadingly that he decided to make "rate cuts to some of [his] therapists based on a collective agreement with [his] office team," that he "reached out to these 3 (not sure if all 3) business owners"—referring to Individuals 4, 5, and 6— with the "intent . . . to see what they were doing with all the upcoming changes [with 'government healthcare'] and how they would adjust to the major rate cuts," and that "[n]o letters, emails, or phone calls ever took place on conducting any rate changes together or collectively as a contracting company," and **Jindal** withheld and concealed that he reached out to Individual 3 in addition to Individuals 4, 5, and 6, and the true intent of his communications to those individuals;

(b)     Later in the day on or about April 28, 2017, following a call with the FTC, **Jindal** sent an email to the FTC attaching certain documents, including a false, falsified, and misleading document titled "Potential List of Competition in the Dallas market" in response to the FTC's request to "[i]dentify the name and

address of each competitor of [Company A] that provides physical therapy staffing services." **Jindal** prepared the typed document based on a handwritten list he maintained titled "Competition" that included Company B, Individual 3 and information about Individual 3's Company C, among other therapist staffing companies and their owners, but **Jindal** omitted Companies B and C and Individual 3 from the typed list he provided to the FTC, and withheld and concealed the handwritten "Competition" list and that Companies B and C and Individual 3 were competitors of Company A;

(c)     On or about May 8, 2017, in response to an email from the FTC regarding a voicemail message from **Jindal**, **Jindal** sent an email to the FTC in which he stated falsely and misleadingly, "I will give you any info you need to prove that nothing at all is done collectively with any counterparts," and withheld and concealed information regarding his assertion "that nothing at all is done collectively with any counterparts," including information tending to disprove this assertion;

(d)     On or about September 15, 2017, during an investigational hearing conducted by the FTC ("the September 15 FTC Hearing"), **Jindal** testified falsely and misleadingly that he had "no idea" why he wrote to competing therapist staffing companies that he had Company B "on board," that he had "no idea" what he meant by Company B being "on board," and that he did not discuss with **Rodgers** whether Company B would lower its pay rates, and withheld and concealed the reason why he wrote to competing therapist staffing companies that

he had Company B "on board," the meaning of Company B being "on board," and the fact that he discussed with **Rodgers** whether Company B would lower its pay rates;

(e)     Also during the September 15 FTC Hearing, **Jindal** testified falsely and misleadingly that the intent of his March 10, 2017, texts to competitors was only to find out what they were paying their therapists, not to lower pay rates collectively, and withheld and concealed the intent of those texts;

(f)     Also during the September 15 FTC Hearing, **Jindal** testified falsely and misleadingly that he never heard from competing therapist staffing companies what their pay rates were, that he did not know any of their pay rates, that he never discussed pay rates with competitors including Individual 3 of Company C, and that when he texted Individual 4 of Company D on March 10, 2017, he did not already have any information about Company D's pay rates, and withheld and concealed that he heard from competing therapist staffing companies what their pay rates were, that he knew the pay rates of competing therapist staffing companies, that he discussed pay rates with competitors including Individual 3 of Company C, and that when he texted Individual 4 of Company D on March 10, 2017, he had previously obtained information about Company D's pay rates;

(g)     On or about September 19, 2017, during an investigational hearing conducted by the FTC ("the September 19 FTC Hearing"), **Rodgers** testified falsely and misleadingly that he texted Individual 2 just to ask if Company B had received a letter from a particular home health agency, Company G, regarding a

reduction in the bill rate it would pay therapist staffing companies, that Individual 2 responded Company B had received the same letter and was considering decreasing rates paid to therapists, and that **Rodgers** then told **Jindal** that Individual 2 received the letter and was considering lowering pay rates, and **Rodgers** withheld and concealed that he texted Individual 2 about lowering PTA pay rates, that he did not ask Individual 2 about any letter from a home health agency, and the true content of his follow-up communication with **Jindal**;

(h)     Also during the September 19 FTC Hearing, **Rodgers** testified falsely and misleadingly that his intent in discussing therapist pay rates with Individual 2 was to fish for information about what Individual 2 was going to pay PTs because he was interested in working for Company B, and withheld and concealed the true nature and content of his texts with Individual 2 regarding therapist pay rates;

(i)     Also during the September 19 FTC Hearing, **Rodgers** testified falsely and misleadingly that he did not have any additional communication with Individual 2 after **Rodgers** reported back to **Jindal** about messaging with Individual 2 to ask about a letter from Company G (i.e., the text exchange about which **Rodgers**' testimony was also false and misleading as alleged above in subparagraph 20(g)), that he would not have told Individual 2 that Company A actually lowered its rates because he did not know if **Jindal** was going to do so at the time he texted Individual 2 and **Rodgers** had not had any dialogue with Individual 2 since then, and **Rodgers** withheld and concealed his additional

communications and dialogue with Individual 2, including texting Individual 2 that Company A actually lowered its rates and speaking to Individual 2 by phone about the FTC Investigation; and

(j)      Also during the September 19 FTC Hearing, **Rodgers** testified falsely and misleadingly that he had not asked **Jindal** for any information regarding the FTC Investigation and that **Jindal** mentioned the FTC Investigation to him around the time that **Jindal** first received a letter from the FTC but then **Rodgers** did not hear anything about it again until the FTC contacted him, and withheld and concealed the true nature of his communications with **Jindal** regarding the FTC Investigation.

All in violation of 18 U.S.C. § 371.

## Count Three

> Violation: 18 U.S.C. § 1505 and § 2
> (Obstruction of Proceedings Before the
> Federal Trade Commission)

At all times relevant to this Count:

21.      Paragraphs 1–8 and 10 of Count One and paragraphs 15–17 and subparagraphs 20(a)–(j) of Count Two are repeated, realleged, and incorporated in Count Three as if fully set forth in this Count.

22.      From in or around April 2017, and continuing at least through in or around October 2017, defendant **Jindal** corruptly endeavored to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department or agency of the United States, by the following means:

(a)     In the Eastern District of Texas and elsewhere, **Jindal** made false and misleading statements to the FTC, withheld and concealed information from the FTC, and made phone calls and sent text messages as part of his corrupt endeavor to influence, obstruct, and impede the FTC Investigation; and

(b)     In the Eastern District of Texas and elsewhere, **Jindal** aided and abetted another, specifically **Rodgers**, who corruptly endeavored to influence, obstruct, and impede the FTC Investigation.

23.     For example, among other things, **Jindal** committed, caused to be committed, and aided and abetted the acts in subparagraphs 20(a)–(j) of Count Two. All in violation of 18 U.S.C. § 1505 and § 2.

## Count Four

> Violation: 18 U.S.C. § 1505 and § 2
> (Obstruction of Proceedings Before the
> Federal Trade Commission)

At all times relevant to this Count:

24.     Paragraphs 1–8 and 10 of Count One and paragraphs 15–17 and subparagraphs 20(a)–(j) of Count Two are repeated, realleged, and incorporated in Count Three as if fully set forth in this Count.

25.     From in or around April 2017, and continuing at least through in or around October 2017, defendant **Rodgers** corruptly endeavored to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department or agency of the United States, by the following means:

(a)    In the District of Columbia and elsewhere, **Rodgers** made false and misleading statements to the FTC, withheld and concealed information from the FTC, and made phone calls and sent text messages to the Eastern District of Texas as part of his corrupt endeavor to influence, obstruct, and impede the FTC Investigation; and

(b)    **Rodgers** aided and abetted another, specifically **Jindal**, who, in the Eastern District of Texas and elsewhere, corruptly endeavored to influence, obstruct, and impede the FTC Investigation.

26.    For example, among other things, **Rodgers** committed, caused to be committed, and aided and abetted the acts alleged in subparagraphs 20(a)–(j) of Count Two.

All in violation of 18 U.S.C. § 1505 and § 2.

A TRUE BILL

_____
GRAND JURY FOREPERSON

(Remainder of page intentionally left blank)

Dated:


RICHARD POWERS
Acting Assistant Attorney General
Antitrust Division
United States Department of Justice



MARVIN N. PRICE, JR.                    RYAN DANKS
Director of Criminal Enforcement        Chief
Antitrust Division                      EMMA M. BURNHAM
United States Department of Justice     Assistant Chief
                                        Washington Criminal I Section
                                        Antitrust Division
                                        United States Department of Justice



NICHOLAS J. GANJEI                      MATTHEW W. LUNDER
Acting United States Attorney           JARIEL A. RENDELL
Eastern District of Texas               DOHA MEKKI
                                        RACHEL KROLL
                                        Trial Attorneys
                                        Antitrust Division
                                        United States Department of Justice
                                        450 Fifth Street N.W., Suite 11300
                                        Washington, DC 20530

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:20-CR-358 |
| | § | JUDGE ALM/KPJ |
| NEERAJ JINDAL (1) | § | |
| JOHN RODGERS (2) | § | |

## NOTICE OF PENALTY

### Count One

**Violation:**      15 U.S.C. § 1
(Antitrust Conspiracy: Price Fixing)

**Penalty:**      Imprisonment for not more than 10 years, a fine not to
exceed $1,000,000, or both; and supervised release of
not more than three (3) years.

**Special Assessment:**      $100.00

### Count Two

**Violation:**      18 U.S.C. § 371
(Conspiracy to Commit Offense)

**Penalty:**      Imprisonment for not more than 5 years, a fine not to
exceed $250,000 (or twice the pecuniary gain to the
defendant or loss to the victim), or both; and
supervised release of not more than three (3) years.

**Special Assessment:**      $100.00

### Count Three

**Violation:**      18 U.S.C. § 1505 and § 2
(Obstruction of Proceedings Before the Federal Trade
Commission)

Indictment – Page 17

Penalty:             Imprisonment for not more than 5 years, a fine not to
                     exceed $250,000 (or twice the pecuniary gain to the
                     defendant or loss to the victim), or both; and
                     supervised release of not more than three (3) years.

Special Assessment:   $100.00

## **Count Four**

Violation:           18 U.S.C. § 1505 and § 2
                     (Obstruction of Proceedings Before the Federal Trade
                     Commission)

Penalty:             Imprisonment for not more than 5 years, a fine not to
                     exceed $250,000 (or twice the pecuniary gain to the
                     defendant or loss to the victim), or both; and
                     supervised release of not more than three (3) years.

Special Assessment:   $100.00